**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**DANIEL BARNETT and
WILDLIFE FARMS, INC.**                                         **PLAINTIFFS**

**v.**                            **CASE NO. 4:05-CV-1328 GTE**

**HERBERT KOHLER, and
KOHLER COMPANY**                                          **DEFENDANTS**

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Presently before the Court are the Motions for Summary Judgment filed by Defendants.

**I.  Undisputed Facts**

Plaintiff Wildlife Farms, Inc. operated a commercial hunting facility in Casscoe, Arkansas.

Between late 2004 and early 2005, Wildlife Farms was owned principally by three individuals:

Daniel Barnett, Boyd Rothwell and Bill Thompson.  Barnett, Rothwell, and Thompson were also

majority owners of another commercial hunting facility near Brinkley, Arkansas which was known

as Wildlife Farms II.  Rothwell and Thompson decided to divest their interest in Wildlife Farms and

negotiated an agreement ("the Redemption Agreement") whereby Plaintiff Wildlife Farms would

repurchase the interests of Rothwell and Thompson in Wildlife Farms either through a refinancing

or through a sale to a third party or parties.  Under the terms of the Redemption Agreement, Rothwell

and Thompson would receive payment for their stock in Wildlife Farms ($1.4 million),

compensation for amounts paid individually by Rothwell and Thompson for the benefit of Wildlife

Farms ($460,154), a sum for "their troubles" ($50,000), and Mr. Barnett's interest in Wildlife Farms

II.  The Redemption Agreement set forth certain deadlines within which Mr. Barnett was to arrange

financing for the redemption of Rothwell's and Thompson's stock in Wildlife Farms' assets. If these deadlines were not met, then Rothwell and Thompson, who together owned a controlling percentage of the stock in Wildlife Farms, would be entitled to vote their shares to sell the assets of Wildlife Farms without consulting Mr. Barnett.  After the Redemption Agreement was executed in May 2005, Mr. Barnett decided to pursue a sale of Wildlife Farms' business and assets rather than seek refinancing of the debt, and caused Wildlife Farms to contract with the National Auction Group to auction Wildlife Farms' assets.

The National Auction Group began advertising and soliciting bidders for an auction scheduled for August 16, 2005 in which assets were to be sold either in fractional interests or as a whole. The proposed contractual documents included in the National Auction Group packet of information were drafted such that they only contemplated a sale in fractional interests.  The auction materials contemplated that the purchaser(s) would sign and agree to be bound by several ancillary agreements including an operating agreement for the Wildlife Farms Property Owners' Association, LLC, an asset sale and purchase agreement between Wildlife Farms, LLC, and the Wildlife Farms Property Owners' Association, LLC, and a management agreement between Wildlife Farms Property Owners' Association, LLC, as owner and Wildlife Farms, Inc., as Operator, all of which contemplated that the vast majority of the property would be owned not by the purchaser(s) but by a property owners' association.

Kohler Company, whose resort properties included a hunting and wilderness club, was interested in expanding its hospitality business. On or about August 13, 2005, Herbert V. Kohler, Jr., president of Kohler Company, called the National Auction Group seeking information about a property in Colorado for which he had seen an advertisement. Because National Auction Group's offices were closed at the time of the call, Mr. Kohler heard a lengthy recorded message discussing

many of the properties being offered for sale by the National Auction Group, one of which was Wildlife Farms. He left a message seeking more information about the Wildlife Farms property. Around 4:25 p.m., on August 15, 2005, the day before the auction of Wildlife Farms, a series of e-mails with attachments were sent to Mr. Kohler's assistant at Kohler Company by the National Auction Group. The e-mails contained documents that were provided by National Auction Group to other potential purchasers.

On the day of the auction, Kohler Company transferred $250,000 via wire into the trust account of David M. Hargis. Mr. Kohler informed the National Auction Group representative via telephone that Kohler was only interested in Wildlife Farms as a whole. Mr. Kohler negotiated for the potential sale of Wildlife Farms in its entirety. Mr. Kohler initially proposed a sale price of $7.4 million, but then proposed a price of $8.25 million. Mr. Barnett accepted this price and cancelled the auction of Wildlife Farms.

On August 17, Kohler Company executed a Letter of Intent and faxed it to counsel for Mr. Barnett. After signing the Letter of Intent, Kohler Company wired $657,500 to Mr. Hargis' trust account, bringing the total amount of earnest money on deposit to $907,500. On August 18, Mr. Barnett executed the Letter of Intent for Wildlife Farms. Counsel for Mr. Barnett wrote in a letter of the same date to counsel for Kohler Company that, "Transmitted with this letter is a duplicate of the proposal submitted yesterday by Mr. Herbert V. Kohler, Jr., now accepted and executed by Daniel Barnett for Wildlife Farms, Inc." The Letter of Intent is the only document signed by both parties and is between Wildlife Farms and Kohler Company only. The auction for Wildlife Farms was cancelled.

Pursuant to the Letter of Intent, Wildlife Farms agreed to negotiate exclusively with Kohler Company until August 30, 2005, toward a possible "definitive and binding Agreement." Pursuant

to the Letter of Intent, the Earnest Money deposit could be refunded to Kohler Company only in the event that Wildlife Farms' "representations set forth in the offering/auction information [were] materially untrue or misleading."   The Letter of Intent stated that "the proposed acquisition of Assets" was subject to the negotiation and execution of a definitive agreement.  The Letter of Intent specifies that any agreement to purchase the assets was made subject to the approval of Kohler Company's Board of Directors. The Letter of Intent listed numerous "conditions precedent to closing", including: (1) delivery of all the assets free and clear of encumbrances, (2) Kohler Company's right to inspect the property, conduct testing and review information in possession of Wildlife Farms regarding the Property or Assets, (3) mutually acceptable employment agreements with select personnel, and (4) execution of the Agreement noted above. Pursuant to the Letter of Intent, Wildlife Farms agreed to negotiate exclusively with Kohler Company for a period of time in order to arrive at a definitive agreement for a purchase and sale of Wildlife Farms.

On August 25, 2005, pursuant to the terms of the Letter of Intent, Kohler Company sent a team of Kohler Company employees to inspect the property, assets, and operations of Wildlife Farms. During that inspection, Kohler Company came to believe that Wildlife Farms was suffering from declining revenues. Kohler Company also learned that Wildlife Farms II was or had been operating nearby in Brinkley, Arkansas and that Mr. Barnett and his son, Daniel Barnett, Jr., had been involved in the management of Wildlife Farms II until late in 2004. Neither Kohler Company nor Herbert V. Kohler, Jr., has ever taken possession of the Wildlife Farms property at issue in this lawsuit.

On September 27, 2005, Mr. Barnett commenced this action against Kohler Company and Mr. Kohler individually. On September 28, 2005, David M. Hargis, the attorney who had been representing Mr. Barnett and/or Wildlife Farms regarding the attempted sale and who served as the

escrow agent for the earnest monies tendered by Kohler Company, filed a separate interpleader

action for the purpose of sorting out potential claims to the $907,500 earnest money deposit.


## II. Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment

motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir.

1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] . . . which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III.  Discussion

Defendants seek summary judgment on the grounds that: (i) the Statute of Frauds bars Plaintiffs' breach of contract claim; (ii) Plaintiff's claim for promissory estoppel fails because a valid and enforceable contract exists and because Plaintiffs could not have justifiably relied upon the representations Mr. Kohler allegedly made; and (iii) Plaintiff's claims for fraud and interference with a business expectancy fail as a matter of law. Defendants also asserted that Mr. Barnett lacked standing to pursue this lawsuit as the claims may be asserted only by Wildlife Farms, Inc., or in a derivative shareholder action; however, this argument is now moot with the addition of Wildlife Farms, Inc., as a Plaintiff to this action.

## A.      *Breach of Contract and Quasi-Contract Claims*

There is no dispute that the parties did not enter into a valid, enforceable contract for the sale or purchase of the assets and/or business of Wildlife Farms. Consequently, it appears that the Statute of Frauds bars recovery for breach of contract. While Mr. Barnett had argued that an "auction exception" to the Statute of Frauds applies here, Mr. Barnett now pursues his contract claims under a theory of promissory estoppel.

Where there has been reasonable detrimental reliance upon an otherwise unenforceable promise, courts may enforce the terms of that promise to prevent an injustice:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

*Van Dyke v. Glover*, 326 Ark. 736 (1996) (*quoting* Restatement (Second) of Contracts, § 90 (1981)). "Whether there has been actual reliance and whether it was reasonable is a question for the trier of fact. The party claiming estoppel must prove he relied in good faith on the wrongful conduct and has changed his position to his detriment." *Waterall v. Waterall*, 155 S.W.3d 30 (Ark. Ct. App. 2004).

Plaintiffs assert that Mr. Kohler made an oral contract to purchase Wildlife Farms on August 16, 2005. Allegedly relying upon Mr. Kohler's representations, Mr. Barnett cancelled the auction of Wildlife Farms with the National Auction Group. Defendants argue that Mr. Barnett's reliance upon a verbal promise to purchase Wildlife Farms was unreasonable as a matter of law.

Mr. Barnett testified at deposition that he believed Mr. Kohler made an unconditional promise to purchase Wildlife Farms but that the final terms of the transaction were to be "handled" by his attorneys and Mr. Kohler's attorneys. (Barnett Dep. Tr., p. 69, Exh. 17 of Dkt. #35). Assuming that Mr. Kohler had made an oral guarantee for the purchase of Wildlife Farms,

the subsequent signing of the Letter of Intent by both parties altered the terms of any oral agreement that might have been in place. Indeed, the Letter of Intent, signed by Mr. Kohler on August 17 and by Mr. Barnett on August 18, specifically states that the agreement to purchase Wildlife Farms remained contingent upon certain conditions and the negotiation of a final contract.[1] The language of the Letter of Intent conflicts with the allegedly unqualified nature of Mr. Kohler's oral promise made on August 16.

Given the sophistication of the parties and the factual circumstances incident to the cancelled auction of Wildlife Farms, the Court concludes that no reasonable jury could find that Mr. Barnett justifiably relied upon an oral guarantee by Mr. Kohler to purchase Wildlife Farms. *See, e.g.*, *Yarborough v. DeVilbiss Air Power, Inc.*, 312 F.3d 728, 731 (8th Cir. 2003) ("In the instant case, all the individuals involved were sophisticated businessmen represented by experienced counsel, and, moreover, all of the alleged oral representations concerned matters that were explicitly addressed in the subsequent alteration of the contract. In these circumstances, we believe that it would be unreasonable to rely on an oral guarantee when that guarantee was quite obviously not included in the subsequent written draft of the contract. We thus do not believe that any reasonable jury could find that the plaintiffs' reliance was justifiable."). Accordingly, the Court grants summary judgment against Plaintiffs' promissory estoppel claims to the extent that Plaintiffs seek specific performance of an oral contract for the purchase of Wildlife Farms. To the extent that the parties have any claim to the "Earnest Money" deposited in the registry of the Court, such claims should be raised in the pending Interpleader action before this Court,

---

[1] The Letter of Intent sets forth, *inter alia*: (i) the basic terms of the sale of the assets of Wildlife Farms; (ii) the deposit of $907,500 as "earnest money" and the "total purchase price" of $8,167,500; (iii) the closing date of August 30, 2005; (iv) a statement that "[t]he willingness of Buyer to undertake the proposed acquisition of Assets is subject to the negotiation and execution of a definitive agreement . . ."; and (v) other conditions precedent to closing. (Letter of Intent to Purchase, Exh. 10 to Dkt. #35).

*Hargis v. Wildlife Farms, Inc, et al*, Case No. 4:05-cv-01332.

**B.       Fraud Claim**

Plaintiffs claim that Mr. Kohler knowingly made a false representation when he allegedly made an unequivocal promise to purchase the assets of Wildlife Farms on August 16, 2005. To establish fraud, a plaintiff must prove five elements: (1) a false representation of material fact; (2) knowledge or belief by the defendant that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance upon the representation; and (5) damage suffered as a result of that reliance. *Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 580 (2002).

Plaintiffs state that Mr. Kohler unequivocally promised to sign the sale and purchase contract on August 16, 2005, and that Mr. Barnett relied upon this promise when he cancelled the auction of Wildlife Farms with the National Auction Group scheduled for that day. The Court finds this allegation unsupported by the summary judgment record.

Mr. Barnett testified in deposition that he had no knowledge of any documentation prepared by the National Auction Group pursuant to the acceptance of Mr. Kohler's private bid for Wildlife Farms:

> Q.    Do you know what documentation that the National Auction Group did of [sic] the acceptance of that bid?
> A.    I don't – as I say, I left the room and after that you know, I was thanking people for coming and that kind of thing and all that. . . .

(Barnett Dep. Tr., p. 55, Exh. 17 of Dkt. #35).

Mr. Barnett further testified that general counsel for Kohler Company, Natalie Black, found the documents she was given were "too lengthy and complicated" and intended to draft

papers herself to be return within three days:

> Q. Okay. Did anybody with National Auction Group tell you of statements Mr. Kohler made about whether or not there were any documents that he could sign?
>
> A. The National Auction Group?
>
> Q. Right. I'm talking about right around 12:50, the time you say the call happened and conversations were back and forth between Mr. Kohler and this person with the auction group.
>
> A. That's what I'm telling you. When I was walking out of the room, the guy was still talking to Mr. Kohler on the phone. There was a little table in the room and he sat down at that table and I heard him say, "I need your fax number so that I can send these documents to you to sign."
>
> Q. Were – did anybody relay to you any discussions of conversations to the effect that the documents were not drafted such that he – that it could be purchased as a whole?
>
> A. No one in the National Auction Group I don't believe said that. When Mr. Kohler and Natalie got there, she said – she made the comment at dinner that night that this – several National Auction Group guys are still there, Ed Tyler and David Hargis, I believe. No. I think David left. Anyway she said, "This is a little too lengthy and complicated. All we want is like a three page offer and acceptance." And she said, "I will have that to you within the next three days."

(Barnett Dep. Tr., pp. 58-59, Exh. 17 of Dkt. #35). Additionally, Mr. Barnett testified that

he had limited knowledge of any discussions with Defendants or counsel for Defendants

with respect to the documents they were to sign:

> Q. Did you overhear or did someone relay to you any discussion on that day or that night or the next morning when they were down there about the type of document that would be signed?
>
> A. Other than they said Natalie wants to draft the document and said she will have it to us. I think they – Ed was satisfied with that and--
>
> Q. Were there any pressure put on Ms. –Mr. Kohler or Natalie Black to sign the document before they left to your knowledge?
>
> A. What conversation they had with someone else I don't know. The only conversation I had in that respect was with Natalie at breakfast the next morning. She said, "Are you stuck on this closing date" – which I think was two weeks – I think is what it said in the documents. I said, "Well, I would like to." She said, "Well we will get as close to that as well can."

(Barnett Dep. Tr., pp. 59-60, Exh. 17 of Dkt. #35). Indeed, Mr. Barnett appeared to be satisfied with the verbally assented "deal" between himself and Mr. Kohler and had little concern regarding the documents to be prepared and signed subsequently:

> Q.     Okay. In your mind were all the details left to be worked out after the day that or after you hung up or National Auction Group hung up the phone with Mr. Kohler?
>
> A.     The only issue that I'm aware of is – as I told you was my son's property, which [Mr. Kohler] told me he was 99 percent certain would not be a problem. And other than that, everything else went [with the purchase].
>
> Q.     Okay. And as far as documentation of what you believe the deal was – other than just everything and this was included and kind of generally the price, where would I find that?
>
> A.     Well, David Hargis and Ed Tyler I assume were handling that – along with Mr. Kohler's attorneys.
>
> Q.     Do you know whether Mr. Kohler had anything in his possession on the day of the auction that would have told him all the – or given him the ability to know all the particulars of what the rest of the deal was?
>
> A.     As I said, I think it was pretty clear from the conversation we had – other than putting it on paper.

(Barnett Dep. Tr., pp. 68-69, Exh. 17 of Dkt. #35).

From Mr. Barnett's own testimony, the Court finds nothing to indicate that Mr. Barnett relied in any way upon a promise made by Mr. Kohler to sign a sale and purchase contract on August 16, 2005. Rather, it appears clear that Mr. Barnett relied upon his belief that he had made a "deal" with Mr. Kohler for the purchase of Wildlife Farms. Additionally, there is no evidence to suggest that Mr. Kohler falsely indicated an interest in purchasing Wildlife Farms. Mr. Kohler wired the requested $907,500 in "Earnest Money" to the trust account of Mr. Barnett's attorney. Mr. Kohler and Natalie Black apparently flew to Arkansas on the evening of August 16, 2005 and later sent a team of employees to conduct due diligence.

Accordingly, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' claims for fraud as the record lacks evidence from which a reasonable jury could find

that: (i) Mr. Kohler made a promise to sign a contract on August 16, 2005 and that Mr. Barnett

relied upon this promise in cancelling the auction for Wildlife Farms; (ii) Mr. Kohler falsely

proclaimed an interest in purchasing Wildlife Farms in order to induce Plaintiffs to rely upon that

false representation; or (iii) Mr. Kohler or an agent of either Mr. Kohler or Kohler Company

otherwise made a false statement with the intention to induce reliance by the Plaintiffs.


**C.      Interference with a Business Expectancy Claim**

The Arkansas Supreme Court has held that: "To establish a claim of tortious interference

with business expectancy, the plaintiff must prove: (1) the existence of a valid contractual

relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part

of the interfering party; (3) intentional interference inducing or causing a breach or termination of

the relationship or expectancy; and (4) resultant damage to the party whose relationship or

expectancy has been disrupted." *Baptist Health v. Murphy*, 2006 WL 242670 (Ark. Feb. 2, 2006).

Mr. Barnett argues that Defendants interfered with his performance of the Redemption

Agreement with the Wildlife Farms shareholders, that Mr. Kohler had knowledge of the

Redemption Agreement and unconditionally promised to perform, and that Mr. Kohler failed to

perform his promise, this failure partly or wholly prevented performance of the Redemption

Agreement, and Mr. Barnett consequently suffered damages. (Plaintiffs' Brief in Opposition to

Summary Judgment, p. 13, Dkt. #44). In setting forth his argument in favor of his claim for

tortious interference with a business expectancy, Mr. Barnett neglects to address the important

scienter requirement, *to wit*, the "intentional interference inducing or causing a breach or

termination of the relationship or expectancy."  It is undisputed that Mr. Kohler engaged in

negotiations with Plaintiffs, Plaintiffs' counsel, and the National Auction Group, that Mr. Kohler

submitted $907,500 in "Earnest Money," and that Kohler Company conducted extensive due diligence of Wildlife Farms. There is no evidence here showing that Mr. Kohler intended to interfere with a business or contractual relationship of Mr. Barnett. Mr. Barnett's only evidence in this regard is the fact that (i) Mr. Kohler knew of the Redemption Agreement and (ii) Mr. Barnett suffered under the terms of the Redemption Agreement due to delays in the sale of Wildlife Farms. Mr. Barnett attempts to satisfy the scienter requirement here with evidence of mere knowledge of a business or contractual relationship.

As there is no evidence to support a reasonable finding that Mr. Kohler intended to tortiously interfere with a business expectancy or contractual relationship, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' claims for interference with a business expectancy.

IT IS THEREFORE ORDERED that the Motions for Summary Judgment filed by the Defendants (Dkt. #7, 35) be, and they are hereby, GRANTED.

Dated this  7th  day of September, 2006.


　　　　　　　　　　　　　/s/ G. Thomas Eisele
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE